## Case No. 144.

### The ALBION LINCOLN.

[1 Lowell, 71.][1]

District Court, D. Massachusetts. April, 1866.

SALVAGE—COMPENSATION—APPORTIONMENT—VALUE OF GOODS.

1. Where five distinct sets of salvors took part in stripping and unloading a stranded vessel, they have not separate liens on the several articles saved by each set, but all are entitled to be paid out of all the property saved.

2. The award to each set of salvors who strip and discharge a wrecked vessel does not usually depend upon the value of the goods which each actually saved.

[Cited in Scott v. Four Hundred and Forty-Five Tons of Coal, 39 Fed. Rep. 287.]

3. The value of the property saved is usually estimated at the time and place of salvage;

[1][Reported by Hon. John Lowell, LL.D., District Judge, and here reprinted by permission.]

but where the salvors refused to deliver the property to the owners, and neglected to bring their libels until after the goods had fallen in market value. *held*, that the price was to be ascertained when the libels were filed and the warrants to deliver executed.

[4. Cited in The Cairnsmore, 20 Fed. Rep. 524, to the proposition that the reward for salvage service is affected, among other things, by the value of the property saved.]

[In admiralty. Libel for salvage. Decree for libelants.]

Salvage. On Wednesday, January 18, 1865, the bark Albion Lincoln, bound from some port in the West Indies for Portland, with a cargo of molasses, got on shore at Nashawena, an island at the entrance of Vineyard sound, lying about fifteen miles from New Bedford on one side and Holmes Hole on the other. The vessel came off the rocks, but had lost her rudder, and was not in a condition to be navigated to a place of safety. Some men from the neighboring island of Cuttyhunk came on board, and were employed to pump. The mate went to New Bedford for assistance, arriving there in the afternoon. Finding that no steamer was to be had, he engaged the libellant Baker, with his pilot-boat Dragonet, to go with him and tow off the bark. They were unable to reach the spot that night, but came to anchor at the nearest place of safe anchorage. Early in the morning, the master and crew of the bark came on board the Dragonet and informed them that the vessel had gone ashore again during the night, and was fast on the rocks. It was plain that the pilot-boat was not well suited to the service that would now be required of receiving the cargo from the Albion Lincoln. Captain Baker, however, was an experienced wrecker, and had vessels and men at New Bedford; and upon a representation of these facts to the master he agreed that Baker should go to work and save what was possible of vessel and cargo, and be paid a reasonable compensation. In the mean time, the schooner Independence, belonging to the libellant Cromwell, of Holmes Hole, had arrived with a crew of picked men, accustomed to such service. They had heard of a vessel in the sound with her colors union down, and had come out to her assistance. Making a harbor of necessity the evening before, at Tarpaulin Cove, and arriving very early in the morning, they found the bark deserted. By inquiry on shore, they learned that the master was on the pilot-boat, and Captain Cromwell went to see him. What passed there was stated very differently by different witnesses; Captain Baker said he agreed with Capt. Cromwell to be jointly interested with him in the salvage. Cromwell denied this. There was no doubt, however, that Cromwell's assistance was accepted on some terms, and all went to work to strip the vessel, so far as was proper and prudent, to lighten her; this work, and the

saving of five or six hogsheads of molasses, occupied the whole of that day (Thursday). Towards night, the master of the bark and his crew went to New Bedford with Captain Baker, in the Dragonet, intending to return the next day with two wrecking schooners, the Z. Secor and the Experiment, which belonged to Baker. They procured the vessels, manned them, and started, but were detained by ice, and could not reach the wreck until Sunday afternoon or evening. Monday and Tuesday were stormy; but on Wednesday, Jan. 25, Captain Baker saved some hogsheads of molasses. In the mean time, on the first Friday evening, the Emma Jane, a light-draft schooner, able to lie alongside the wreck, arrived, and Capt. Cromwell made a bargain for her assistance, and during Friday and Saturday these two vessels got out a considerable part of all the cargo that was saved. They saved something, though not much, on the second Wednesday and Thursday. Two other vessels, the Platten See and the Martin Van Buren, also saved some cargo. All this before Captain Baker's return. Captain Church, who came down with the first party on the Dragonet, remained during the whole time, and had some sort of charge of the vessel, but not a general supervision of the business. He worked chiefly with the men from Cuttyhunk, who remained during the whole time. By Thursday night, January 26, or Friday morning, it was discovered that the molasses, which had been stowed with the bungs of the hogsheads out, as is usual in voyages from the West Indies, was so far mixed with water, that it was not worth saving, and all parties gave up the work.

T. M. Stetson, for Cromwell.
A. Mackie, for Baker & Church.
T. K. Lothrop and W. J. Forsaith, for claimants.

LOWELL, District Judge. Two libels are brought here. One by Captain Baker, for himself and the several officers and men of his three vessels, with whom joins Captain Church, for himself and the men from Cuttyhunk; the other by Captain Cromwell and Captain Cleveland, of the Independence and Emma Jane, for themselves and the crews of those vessels. It is said that the master and owners of the Platten See and Martin Van Buren have arranged with the owners of the molasses for compensation to be paid hereafter. The sails, spars, and rigging, were taken to New Bedford, and sold by auction; the cargo was somewhat scattered, but was collected at Holmes Hole, and eventually sent to New York and sold. The net proceeds of the sale are about five thousand two hundred dollars. And upon this the question is made, what value I am to assume for the property saved. It seems that the market price of molasses fell very rapidly during the interval between the saving

and the sale of this cargo; and the libellants say, this fluctuation of values is at the risk of the general owner. It is undoubtedly true, as a general proposition, that the value, at the time and place of saving, is to be considered rather than the value at any other time and place, because this shows the benefit done to the owner of the property, if he receives it then and there, whatever disposition he may choose to make of it: The George Dean, Swab. 290. But in this case, the owners did not receive their property, and the salvors refused to let them take it, and brought their libel after the owners had begun to attempt its removal and had hired a vessel to take it to New York, and this was a long time after the goods had been landed. It is argued that the claimants are responsible for this delay. But the evidence does not bear out this contention. The underwriters' agents appear to have tried, in good faith, to compromise the matter, and to have made an offer which was entirely liberal; but a settlement was prevented by the conflicting claims and pretensions of the different salvors. At all events, no settlement was made; and down to the day the second libel was filed, the owners had not full possession of their property, and were not bound, personally, to pay anything for its having been saved. If it had been destroyed at that time, no action could have been sustained against them for salvage, properly so called, though possibly something might have been recovered for actual expenses. This state of facts raises the distinction between the present case and those cited at the bar, as, for instance, that concerning the conversion of a whale, decided in January last. In this case, there was no contract, and no responsibility for a specific part of the goods deliverable at the time and place of salvage; but only for such sum of money, or such part of the goods or of their value, as might be just and reasonable, and the parties could not agree upon that; but the libellants, being at liberty to apply to the court at any time, neglected to apply until the goods had fallen in value. If the court had then ordered an appraisement, or had decreed to the libellants a specific part of the goods, as is sometimes done, it is seen at once that the salvors would sustain their proportion of the loss, as it is right they should. I cannot hold the owners responsible for the value of goods which they were not allowed to take away.

The property was delivered to the claimants, by the marshal, on the 13th of March, and was sold in New York, early in April. Granting that it could have been as well sold at Holmes Hole, of which there is some evidence, it would be proper, in making the estimate, to disallow the expense of getting it to New York, and to take a somewhat earlier time; but a very considerable fall of prices had occurred before any proceedings were had. Upon all the evidence, I assume the value as about six thousand dollars. The services performed by the salvors were meritorious, and at great expense of time. The cargo was under water during a part of each tide and the weather extremely cold, the thermometer, on several days, being at about zero of Fahrenheit; and, altogether, the difficulty and labor were very considerable. A great part of the time consumed, however, especially by Captain Baker and his men, was spent in trying to get an opportunity to work. The fund reckoned on any fair basis, is small, not sufficient to allow of a large salvage reward to any one. This is one of the risks which wreckers take, however, and in the case of most of the libellants, who are often employed in the business, it may be supposed to be made up by the larger reward earned when the property is large.

Another question, much debated in this case, is the principle of the distribution of whatever salvage may be thought reasonable for the whole service. There are five distinct sets of salvors; and most of them have acted upon the theory that their lien and claim are upon the specific goods rescued by them; they put their initials on these casks, and stood guard over them and forbade their removal, have expected a definite part of them for their reward, and have, in one instance, filed their libel against them. This course of proceedings strikes me as novel. I have been accustomed to look upon the vessel, freight, and cargo, or what was saved of them, as one fund, upon the whole of which all the salvors, though not associated by any contract among themselves, had a lien for such sum as, upon the whole, was found due to each. In the case of the vessel and freight this is necessarily so, and I am not aware that any different rule holds with respect to cargo, or to the materials of a ship that has been broken up. The success of the particular salvors, though often a necessary preliminary to the recovery of any reward, is but one element in determining its amount; there are others of great importance, such as the time and labor expended and the risk run. In some reported cases one set of salvors have plainly contributed much more to the safety of the property, and the other set have been allowed as large, and sometimes the larger reward. Success is essential, but that having been obtained, the share depends largely on the nature of the effort: The Santipore, 1 Spinks, 231; The Genesee, 12 Jur. 401; The Atlas, 1 Lush. 518; The E. U., 1 Spinks, 63. As a general rule, the court will not assess a different ratio of salvage upon different parts of the property, according to the labor expended on those parts, though it may do so if the justice of the case requires it. The Vesta, 2 Hagg. [Adm.] 189. And the salvor

who happened to find and rescue a very valuable part of the cargo would not usually be compensated in proportion to its value. It is only one of the elements of the computation. Take in this very case the instance of the men from Cuttyhunk. They were on board the vessel before she was bilged, and every day afterwards. It is impossible to say how far they contributed to save all that was saved by their exertions on the first Wednesday. They got out but little molasses considering their numbers, because they worked at the fore hold, from which it was difficult to discharge the cargo. But they had as good a right to work at the after hold as the crews of the Emma Jane and the Independence; any arrangement they may have made for a division of labor, was made. as I must presume, for their common convenience; and they appear to stand very much alike, except that Captain Church's men were able to sleep on shore with their families, and therefore were not subject to so much discomfort, which is a point of some importance; and they furnished no vessels or other appliances.

Coming to Captain Baker's case, we find that he employed nearly as many men as Captains Cromwell and Cleveland, and one more vessel; but he did not arrive in time to save a great deal of the cargo, and his men were not subjected to the same hardship or severity of labor. I do not find that Captain Baker has made good his demand to share equally with Captain Cromwell. on the strength of a bargain with him to that effect. Even setting aside the express denial of the latter, the conversation reported by Baker hardly amounts to such a contract; and when I consider the various circumstances of the case which would render such an agreement improbable, and others which seem to show that the conduct of Cromwell was inconsistent with it, I cannot say that any such bargain was fully understood by him, however it may have been with the other party. But Baker's time, expense, and exertions are entitled to be considered in apportioning the salvage, just as Captain Cromwell's time, trouble, and expense connected with the shipping and care of the steam-pump are to be taken into account. They were all working for a common object, and to that extent are necessarily interested together, whether they intended to be so or not. It is not possible to say precisely how far each contributed to the whole result, nor precisely what one might have saved if the others had not saved what they did. It is upon these principles that I shall divide the salvage: and I am glad to find that, looked at merely as wages, it will not be entirely insignificant. The case does not require me to make distribution to the individuals, but only to the different sets of salvors. I shall decree to the Independence and Emma Jane, $1500;

to Captain Baker. for himself and his crew, $600; to Captain Church, and the men from Cuttyhunk, $350. Decree accordingly.